Filed 10/22/25  In re W.P. CA5

## <u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re W.P., Jr., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>W.P.,<br><br>Defendant and Appellant. | F089839<br><br>(Super. Ct. No. 23JD0217)<br><br>**OPINION** |

-ooOoo-

## <u>THE COURT</u>[*]

APPEAL from an order of the Superior Court of Kings County.  Marianne Gilbert, Judge.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Lozano Smith, County Counsel, and Thomas Y. Lin, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P. J., Franson, J. and DeSantos, J.

W.P. (father)[1] appeals from the juvenile court's order terminating parental rights (Welf. & Inst. Code,[2] § 366.26) as to his minor son, W.P., Jr. (W.P.).  Father contends the court erred by (1) failing to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) and (2) finding the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA)[3] did not apply because the Kings County Human Services Agency (agency) did not conduct an adequate inquiry.  The agency concedes the record does not disclose that an adequate ICWA inquiry was conducted.

We conditionally reverse the order terminating parental rights and remand for further proceedings to ensure compliance with the inquiry provisions of ICWA and the California Indian Child Welfare Act (§ 224 et seq.) (Cal-ICWA).  In all other respects, the order is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2023, the agency filed a juvenile dependency petition on behalf of newborn W.P.  The petition alleged W.P. came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) because of mother's failure to protect him due to her substance abuse, as she and W.P. tested positive for methamphetamine and fentanyl at the time of his birth, as well as section 300, subdivision (j) because of mother's previous abuse or neglect of W.P.'s half siblings due to substance abuse related issues.

Father was listed on the petition as W.P.'s alleged father.  Though no allegations were made pertaining to him, the agency reported that he and mother were an intact

---

[1]     In early filings, including the petition, father's name is incorrectly listed as J.P.

[2]     All further undesignated statutory references are to the Welfare and Institutions Code.

[3]     "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many."  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1, disapproved on other grounds in *In re Dezi C.* (2024) 16 Cal.5th 1112.)

2.

couple, and, because they resided together, father knew or should have known that mother's substance abuse put W.P. at risk of harm. The agency further reported father was not cooperative with the agency in its efforts to assess his own substance use. For these reasons, the agency opined release of W.P. to father would be detrimental and recommended against it.

At the detention hearing, father was present and was appointed counsel. At his request, the juvenile court ordered genetic testing to determine paternity. Mother was not present, and her whereabouts were unknown.[4] W.P. was ordered detained from both parents.

The agency subsequently filed an amended dependency petition, adding an allegation under section 300, subdivision (g) based on mother fleeing the hospital when the agency was investigating the referral, leaving W.P. with no caretaker.

At the jurisdiction and disposition hearing conducted on January 4, 2024, neither parent was present. The juvenile court found that W.P. was described by section 300, subdivisions (b) and (g).[5] The court adjudged W.P. a dependent of the court, ordered him removed from mother's custody, and denied her reunification services pursuant to section 361.5, subdivision (b)(10) due to her failure to reunify with W.P.'s half siblings in a separate dependency proceeding. The court set a section 366.26 hearing. No specific findings or orders were made pertaining to father. It was reported at the hearing that he did not attend his paternity test that had been scheduled for the day before the hearing.

The agency had attempted to set up monthly visitation with father in November and December 2023, but father did not arrange visitation until mid-January 2024. He

---

[4] Mother's participation in the case was limited. She attended some visits with W.P. and attended two court hearings. Her first court appearance was by telephone on April 30, 2025. She was also present in court in custody on May 13, 2025.

[5] The juvenile court struck the section 300, subdivision (j) allegation based on the parties' agreement because it contained a factual inaccuracy.

visited with W.P. once in January and once in March 2024 and was reported to be appropriate during the visits.

By the time of the first section 366.26 hearing on April 25, 2024, the agency had obtained W.P.'s birth certificate, on which father's name was listed. The genetic testing had not been completed at that point because, although father had given his sample since the previous hearing, W.P. had not. Father requested to be elevated to at least the status of biological father. The juvenile court elevated father to presumed status and continued the matter so that the agency could assess father for services given the paternity status change.

On May 28, 2024, the juvenile court vacated the continued section 366.26 hearing date and granted father reunification services, including parenting classes, substance abuse testing, and a requirement that father inform the agency of any adults who live in his home so they may be assessed for safety to be around W.P. Father was ordered weekly supervised visitation.

During the reunification period, father was confirmed to be W.P.'s biological father by the then-completed genetic testing. It was reported father was not receptive to his case plan and made it difficult for the agency to communicate with him. The agency believed he lived with mother, and witnesses reported the two engaged in domestic disputes. Father did not allow the agency to access his home for safety or schedule home contacts. Father completed parenting classes but was unable to express what he learned, and he was not in compliance with substance abuse services. He did consistently attend visitation, however, and continued to be appropriate with W.P. and attend to his needs. Based on father's lack of engagement with his case plan, the agency recommended father's services be terminated.

At the six-month review hearing on January 8, 2025, the juvenile court followed the agency's recommendations. Father's services were terminated, and a section 366.26 hearing was set.

Ahead of the section 366.26 hearing, the agency recommended termination of parental rights and adoption with W.P.'s care providers, his maternal uncle and aunt, as his permanent plan. W.P. had been living with his care providers since the outset of the case, when W.P. was 10 days old and released from the hospital following his birth. W.P. did not display any developmental, emotional, behavioral, or medical concerns, and the care providers were adequately meeting W.P.'s daily needs. The care providers were nurturing and attentive, and W.P. responded well and appeared comfortable. The care providers had recently adopted one of W.P.'s half siblings and wished to adopt W.P. as well. They were willing to maintain an ongoing relationship with W.P.'s other half sibling who lived with other relatives, as well as his paternal grandparents. They were not, however, willing to continue visitation with father at the time because father had been "making threats and accusations" toward them but were open to doing so in the future if it were safe and in W.P.'s best interests.

As for visitation between W.P. and father during the dependency proceedings, the agency reported father was late to and missed some visits but generally engaged with W.P. in an age-appropriate manner. He was observed to feed, change, and burp W.P. He took pictures and videos of him, held him, and rocked him when he cried. No concerns were noted during visits. When father's reunification services were terminated, visits had returned to once per month. The agency opined it would not be detrimental for parental rights to be terminated due to W.P.'s young age and minimal contact with the parents.

A contested section 366.26 hearing was conducted on May 13, 2025. Father testified that W.P. was "most definitely" comfortable in his presence and seemed happy to see him. Father stated he loved W.P. very much and believed W.P. loved him and knew he was his father. Father described one occasion, where the paternal grandparents attended a visit, and W.P. asked father to hold him because he was not used to the grandparents yet. Father further testified W.P. transitioned well after visits.

Father testified he objected to the adoption recommendation because he "want[ed] to have a chance to be a father to [W.P.]."  When asked if he believed the care providers were providing good care, he noted one occasion where he was concerned about cleanliness but "for the most part," he believed W.P. was receiving the love and attention he required.

Father asked the juvenile court to apply the beneficial parent-child relationship exception to termination of parental rights.  Mother made a general objection to termination.  Minor's counsel and the agency asked the court to follow the agency's recommendations.

In ruling, the juvenile court noted it had considered father's testimony but went on to state, "the interests of the child at this point in this case is what is the most prevailing factor.  The law states that the placement for the child where he's thriving should not be broken."  The court found W.P. was adoptable and ordered parental rights terminated and that W.P. be placed for adoption.  It did not specifically address the beneficial parent-child relationship exception by name.

The juvenile court also found ICWA did not apply.  Throughout the proceedings, the agency had regularly provided ICWA inquiry updates in its reports.  The documentation provided demonstrated that over the course of the proceedings, the agency made inquiry of father, the maternal uncle, the maternal grandmother, and the paternal grandparents, all of whom denied Indian ancestry.  The agency also attempted contact with mother and the maternal great-grandfather but were unsuccessful in doing so.  The agency further reported that in the recent dependency case involving W.P.'s half siblings, part of which overlapped in time with the present case, either mother or a maternal relative claimed Blackfeet ancestry, and "[r]eason to [b]elieve" letters were sent to relevant tribes in efforts to determine eligibility.  Subsequent to this further inquiry in the other dependency case, the court found that ICWA did not apply to those proceedings in February and March 2024.  The agency continued to attempt to contact mother and the

maternal great-grandfather in connection with the present case but were unable to reach them for inquiry.

## DISCUSSION

### I.     Beneficial Parent-Child Relationship Exception

#### A.     *Legal Principles*

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., at subd. (c)(1)(B)(i).)

A parent seeking to establish the beneficial parent-child relationship exception applies has the burden to prove by a preponderance of the evidence three elements to justify its application: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 632–633, 636–637 (*Caden C.*).)

The second element may involve considering factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The third element involves determining "how the child would be affected by losing the parental relationship" by considering factors such as whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The question for the juvenile court is "does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid.*)

The juvenile court's factual findings are reviewed for substantial evidence, and its ultimate determination of whether, in weighing competing interests, the facts constitute a compelling reason for determining termination would be detrimental to the child is reviewed for abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641.) "A court abuses its discretion only when ' " '[it] has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

**B.      *The Juvenile Court Did Not Make a Mistake of Law***

As stated above, the juvenile court did not expressly address each element of the beneficial parent-child relationship exception; rather, before delivering its findings and orders, it noted it considered father's testimony, that its primary consideration was W.P.'s best interests, and that "[t]he law states that the placement for the child where he's thriving should not be broken."

Father briefly contends the juvenile court erred by "not … address[ing]" the exception. We disagree.

The juvenile court is not required to make express findings as to the elements of the exception on the record when it concludes termination of parental rights will not be detrimental. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 (*A.L.*).) On appeal, we

indulge "[a]ll intendments and presumptions … to support [the judgment] on matters as to which the record is silent (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563) and imply all findings necessary to support the judgment where no statement of decision is required (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970). Thus, because the court ordered parental rights terminated, we presume it determined the beneficial parent-child relationship exception did not apply and that it made the necessary factual findings and inferences to support this determination.

In any event, we do not agree with father's assertion that the juvenile court did not "address" the exception. Though the court did not give a lengthy analysis of each element of the exception, we find it indicated clearly enough by its comments that it did not find father had shown a compelling reason not to order adoption.

Father also contends that by stating that the "law … states … placement for a child where the child is thriving[] should not be broken," the juvenile court "made a mistake of law" by "consider[ing] whether it would benefit [W.P.] to be moved" because that is not an appropriate factor in determining whether the beneficial parent-child relationship exception applies. We disagree with father's interpretation of the court's statement.

We presume the juvenile court knew and followed the law (*Wilson v. Sunshine Meat & Liquor Co.*, *supra*, 34 Cal.3d at p. 563), and father has not persuasively rebutted this presumption. We review the court's statement regarding W.P.'s placement not being "broken" in the context of a section 366.26 hearing. At that point in the proceedings, as we have stated, the legislative preference is adoption, and it should only not be selected as a child's permanent plan if the court is faced with a compelling reason not to as defined by statute. When determining if the beneficial parent-child relationship exception applies, the court must balance the child's interest in the relationship against the benefits of stability and permanence adoption provides. With this context, we do not believe the court was improperly considering whether W.P. should or could be placed with the parents. Rather, we interpret the court's statement as it simply noting that W.P.

9.

was thriving in an *adoptive* placement, and that the track to adoption was what should not be "broken" by the application of the beneficial parent-child relationship exception.[6]

For these reasons, we conclude the juvenile court did not make a legal error with regard to failing to make express findings or relying on improper factors.

### C.     *The Juvenile Court Did Not Err by Declining to Apply the Exception*

We presume, without deciding, for the purpose of father's argument, that he visited with W.P. regularly and that W.P. would derive some benefit from a continuing relationship with father. Thus, the question before us is whether the juvenile court abused its discretion, or acted in a manner that was arbitrary, capricious, or patently absurd by implicitly concluding the benefits of adoption outweighed any harm W.P. would suffer by losing the relationship he had with father. We conclude it did not.

Though we recognize that W.P. had positive visits with father and may have enjoyed spending time with him, there is little evidence that W.P. would suffer great harm or detriment by losing his relationship with father, especially when compared to the stability and permanence of adoption.

Because W.P. was detained as a newborn, he had no relationship with father at the time of his initial detention. W.P.'s contact with father for the first six months of the proceedings was very limited, as father did not initially seek to be elevated to presumed father status but requested genetic testing instead and visited with W.P. only a handful of times. Though father visited W.P. weekly during the reunification period, when his services were terminated in December 2024, visitation was again reduced to monthly, meaning by the time of the section 366.26 hearing, in May 2025, W.P. had seen father another mere handful of times over the course of five months.

---

[6]     Even if we did find the juvenile court's statement to be an erroneous statement of law, father has not shown prejudice resulting from the court's alleged mistake of law. As we explain in the body of the opinion, father points to no compelling evidence in the record that W.P. would suffer detriment from the termination of parental rights that would outweigh the benefits of adoption.

We outline this history of father and W.P.'s visitation pattern to highlight the fact there is no evidence on the record that W.P. had any emotional or physical response to seeing father more or less frequently or that he missed father when he was not in his care. To the contrary, W.P. was doing well in his placement with his maternal relatives, who were the only care providers he had ever known. They had adopted his half sibling and wished to adopt him. Father himself testified W.P. transitioned well at the end of visits. Even on appeal, father "acknowledges the issues with proving detriment," and asks that we "consider that termination will be harmful to [W.P.] based on the facts that were before the court," namely that there were no allegations in the petition pertaining to him and he was loving towards W.P. and attended to his needs in visitation. But this is not our standard of review. Rather, father has the burden of showing the juvenile court's determination was arbitrary, capricious, or patently absurd, and he has not pointed to any evidence that supports such an argument.

Father likens the facts of his case to those in *A.L.* *A.L.* undermines father's position. In *A.L.*, the appellate court found substantial evidence supported the juvenile court's express finding that the father met his burden to show the second element of the exception—that there was a substantial, positive emotional attachment between the child and the father. (*A.L.*, *supra*, 73 Cal.App.5th at p. 1155.) In *A.L.*, at the time of removal, the child was three years old and lived with the father, who had been the child's sole provider and caretaker. (*Id*. at pp. 1137, 1139, 1148.) There was evidence the child "looked forward to" the visits with the father and was "very attached" to him. (*Id*. at pp. 1144, 1148.)

We note none of these facts is present in the present case, but as we have stated, we presume for the purpose of father's argument that a beneficial relationship did exist. What father overlooks about *A.L.* to his argument's detriment is that the juvenile court in that case, despite finding a substantial, positive, and emotional attachment, ultimately concluded the father had *not established* the detriment of losing the relationship

outweighed the benefit of an adoptive home. (*A.L.*, *supra*, 73 Cal.App.5th at pp. 1148–1149.) The minor in *A.L.* had been with her prospective adoptive parents for approximately half of her life. The juvenile court concluded the minor would suffer a loss but one she " 'would be able to adjust to.' " (*Id*. at pp. 1137, 1149.) The appellate court concluded the juvenile court did not abuse its discretion in making that determination and affirmed the court's order terminating parental rights. (*Id*. at p. 1161.)

This case is like *A.L.*, but not for the reasons father suggests. Here, as we have stated, W.P. had been out of father's care for his entire life, was doing well in his potential adoptive placement, and did not display any negative responses when he went from seeing father weekly to seeing him once a month. Like the minor in *A.L.*, it appears that any loss W.P. would experience would be one he could reasonably adjust to.

For these reasons, we find the juvenile court did not err by declining to apply the beneficial parent-child relationship exception to termination of parental rights.

## II. ICWA

Under Cal-ICWA, the court and county child welfare agency "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child."[7] (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court,[8] rule 5.481(a).) The agency's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b)(2).)

---

[7] An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized Indian tribe. (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

[8] All further rule references are to the California Rules of Court.

When initial inquiry gives rise to a "reason to believe"[9] (but not sufficient evidence to determine there is a "reason to know")[10] that an Indian child is involved in a proceeding, "further inquiry regarding the possible Indian status of the child" is required, which includes gathering additional biographical information from family members and contacting relevant tribes and the Bureau of Indian Affairs. (§ 224.2, subd. (e)(2)(A)–(C); see § 224.3, subd. (a)(5) [listing the biographical information required].) "Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

When the court or agency "knows or has reason to know" an Indian child is involved in the dependency proceeding, formal notice to the relevant tribes is required. (§ 224.3, subd. (a).)

The agency "must on an ongoing basis include in its filings a detailed description

---

[9] "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated" in section 224.2, subdivision (d)(1) through (6). (§ 224.2, subd. (e)(1).)

[10] These enumerated grounds for "reason to know" are: "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village … [;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[; and/or] [¶] (6) The court is informed that either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d); see 25 C.F.R. § 23.107(c) (2025).)

of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." (Rule 5.481(a)(5).)

Before finding ICWA inapplicable, the juvenile court must make a finding that the agency conducted a "proper and adequate further inquiry" and exercised "due diligence" in doing so, and that "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

We review the juvenile court's finding that there is no reason to know whether a child is an Indian child for substantial evidence, and the court's finding that the agency has conducted a proper and adequate inquiry and due diligence for abuse of discretion. (*In re K.H.* (2022) 84 Cal.App.5th 566, 600–601.)

Father contends the juvenile court's finding that adequate inquiry was conducted was an abuse of discretion because mother was not inquired with when she was present in court but had claimed Blackfeet heritage in the recent dependency case involving W.P.'s half siblings, and because the agency knew of two paternal relatives, a paternal uncle and paternal half aunt, with whom the agency documented no attempts to make ICWA inquiry. The agency agrees the record does not support that an adequate inquiry was performed.

In an abundance of caution, we accept the agency's concession. As to mother's side of the family, the agency represented in its reports that in the separate dependency case regarding W.P.'s half siblings, mother or a maternal relative claimed Blackfeet ancestry. This would have triggered the agency's duty of further inquiry, requiring it to, among other things, gather biographical information from family members and make contact with relevant tribes to obtain more information about whether W.P. was an Indian child in order to comply with section 224.2, subdivision (e)(2)(A) through (C). It appears the agency did take steps to discharge its duty of further inquiry as to this claim, but it is unclear from the record exactly what those steps were or what information was obtained

14.

or provided to the relevant tribes. While we acknowledge that the juvenile court presiding over the other case appears to have found the agency conducted adequate inquiry by finding ICWA did not apply, because we do not have the information underlying those findings before us, we are unable to make an adequate review. The claim of maternal Blackfeet ancestry, though not made specifically in connection with the present case, bears upon W.P.'s potential status as an Indian child.

Upon remand, the agency, at the very least, should take steps to make the record in the present case clearer by complying with rule 5.481(a)(5) by providing a "detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes" for the juvenile court to review. This may simply include providing additional information regarding how it was determined in the other case that there was no reason to know W.P. was an Indian child given the claim of Blackfeet ancestry, or the agency may have to make additional inquiry or inquiry efforts. We cannot say exactly what else needs to be done based on the record before us but rest assured that the juvenile court is best positioned to make a determination as to the reasonableness of the inquiry in the first instance. (See *In re K.H.*, *supra*, 84 Cal.App.5th at p. 621.)

As for father's side of the family, the agency concedes they must inquire of additional paternal family members who father mentioned during his social study—the paternal uncle and the paternal half aunt. While there is no documentation showing the agency attempted to contact these relatives, the agency did make inquiry of father and the paternal grandparents. We believe the juvenile court could have reasonably concluded the paternal uncle and half aunt would not have information pertaining to W.P.'s status as an Indian child that the father and both grandparents did not have. Thus, had an adequate inquiry been conducted as to the maternal side, and this was the only alleged error, we likely would have found the court's inquiry finding was within its discretion as to the

15.

paternal side of the family.  However, since the matter must be remanded for the agency to complete documentation as to the maternal side, the agency is certainly not precluded from making and is encouraged to make additional inquiry of reasonably available paternal family members in an abundance of caution.

For the above reasons, the matter must be remanded for the agency to, at the very least, provide the relevant documentation for the juvenile court to review.  (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1151.)

## DISPOSITION

The order terminating parental rights is conditionally reversed.  The matter is remanded to the juvenile court for compliance with the inquiry and notice requirements of sections 224.2 and 224.3 and the documentation provisions of rule 5.481(a)(5).  If the court thereafter finds a proper and adequate further inquiry and due diligence has been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the order terminating parental rights.  If the court concludes ICWA applies, then it shall proceed in conformity with ICWA and Cal-ICWA.  (See 25 U.S.C. § 1912(a); §§ 224.2, subd. (i)(1), 224.3, & 224.4.)